### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| **DAVID ROBINSON SR.**, on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> **MARQUIS SOFTWARE SOLUTIONS, INC.** and **NORWAY SAVINGS BANK**, <br><br> Defendants. | Case No. 4:25-cv-01306 <br><br><br><br><br><br><br><br> **DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

David Robinson Sr. ("Plaintiff"), through his attorneys, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendants Marquis Software Solutions, Inc. ("Marquis") and Norway Savings Bank ("Norway") (together, "Defendants"), and their present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiff alleges the following on information and belief—except as to his own actions, counsel's investigations, and facts of public record.

### NATURE OF ACTION

1.  This class action arises from Defendants' failure to protect highly sensitive data.

2.  Defendant Marquis Software Solutions, Inc. is a software firm that provides "marketing and compliance solutions" to "700+ banks and credit unions[.]"[1]

---

[1] *About Us*, MARQUIS, https://gomarquis.com/who-we-are/about-us (last visited Nov. 25, 2025).

3.     Defendant Norway Savings Bank is a "mutual banking and financial services company headquartered in Norway, Maine."[2]

4.     Norway is an enterprise customer of Marquis—and thus, Norway provides the personal identifiable information ("PII") about its current and former customers to Marquis. But Defendants lost control over that data when cybercriminals infiltrated their insufficiently protected computer systems in a data breach (the "Data Breach").

5.     It is unknown for precisely how long the cybercriminals had access to Defendants' network before the breach was discovered. In other words, Defendants had no effective means to prevent, detect, stop, or mitigate breaches of their systems—thereby allowing cybercriminals unrestricted access to their current and former customers' PII.

6.     On information and belief, cybercriminals were able to breach Defendants' systems because Defendants failed to adequately train their employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII. In short, Defendants' failures placed the Class's PII in a vulnerable position—rendering them easy targets for cybercriminals.

7.     Plaintiff is a Data Breach victim. He brings this class action on behalf of himself, and all others harmed by Defendants' misconduct.

8.     The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before this data breach, their current and former customers' private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

---

[2] *About the Bank*, NORWAY SAVINGS BANK, https://www.norwaysavings.bank/get-to-know-us/about-the-bank/ (last visited Nov. 25, 2025).

## PARTIES

9.     Plaintiff, David Robinson Sr., is a natural person and a citizen of Maine. He is domiciled in Maine (where he intends to remain).

10.     Defendant, Marquis Software Solutions, Inc., is a corporation incorporated in Texas and with its principal place of business at 6509 Windcrest Drive, Suite 170, Plano, Texas 75024. The registered agent for service of process is CT Corporation System, 1999 Bryan St., Suite 900, Dallas, Texas 75201.

11.     Defendant, Norway Savings Bank, is a mutual corporation incorporated in Maine and with its principal place of business at 261 Main Street, Norway, Maine 04268. The registered agent for service of process is Daniel P. Walsh, 261 Main Street, Norway, Maine 04268.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Plaintiff and Defendant Marquis are citizens of different states. And there are over 100 putative Class Members. Defendant Marquis is a citizen of Texas.

13.     This Court has personal jurisdiction over Defendants because Marquis is headquartered and has its principal place of business in the Sherman Division of the Eastern District of Texas, and because both Marquis and Norway regularly conduct business in Texas and have sufficient minimum contacts in Texas.

14.     Venue is proper in this the Sherman Division of the Eastern District of Texas because Defendants' principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## BACKGROUND

### Defendants Collected and Stored the PII of Plaintiff and the Class

15.    Defendant Marquis Software Solutions, Inc. is a software firm that provides "marketing and compliance solutions" to "700+ banks and credit unions[.]"[3]

16.    Defendant Norway Savings Bank is a "mutual banking and financial services company headquartered in Norway, Maine."[4]

17.    As part of their business, Defendants receive and maintain the PII of thousands of their current and former customers.

18.    In collecting and maintaining the PII, Defendants agreed it would safeguard the data in accordance with their internal policies, state law, and federal law. After all, Plaintiff and Class Members themselves took reasonable steps to secure their PII.

19.    Under state and federal law, businesses like Defendants have duties to protect their current and former customers' PII and to notify them about breaches. Defendants recognize these duties.

20.    As recently as September 6, 2025, Marquis advertised in its "Privacy Policy" the following:

a.    "At Marquis Software Solutions Inc., we respect your privacy, and work hard to protect your personal information."[5]

---

[3] *About Us*, MARQUIS, https://gomarquis.com/who-we-are/about-us (last visited Nov. 25, 2025).
[4] *About the Bank*, NORWAY SAVINGS BANK, https://www.norwaysavings.bank/get-to-know-us/about-the-bank/ (last visited Nov. 25, 2025).
[5] *Privacy Policy*, MARQUIS (Sept. 16, 2020)
https://web.archive.org/web/20250906184908/https://gomarquis.com/privacy-policy.

b. "This Policy explains our practices regarding the personal information we collect about customers of financial institutions as part of our role as a service provider in the financial industry."[6]

c. "This Policy applies to information we collect through our software and websites (including https://gomarquis.com/), from your financial institution, or through your written or verbal communications with us (collectively, our 'Services')."[7]

d. "This Policy applies whenever you or your financial institution use our Services."[8]

e. "Our contractual agreements with our client financial institutions generally require us to follow the same practices as they do with respect to the privacy and protection of personal information."[9]

f. "Our software solutions collect the following categories of personal information and we have access to provide services for some financial institution clients: Identifiers (for example, name, alias, title, username); Contact Information (for example, email address, postal address, phone number, communication preferences); Bank Account, Mortgage, Credit Card, Loan, and Insurance Information for Accounts You Hold at Financial Institutions that Use Our Services (including account numbers, expiration dates, loan balances, credit limits, and related information); Demographics

---

[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.*

/ Account Application Information (i.e., birthdate and age, gender, employment, education, earnings, and other information you may have provided your financial institution when you applied for an account, loan, or insurance product); Protected Classification Characteristics Age, Race or color, National origin, marital status, sex or Ethnicity. Commercial Information (for example, which products and services offered by your financial institution you've enrolled in, considered, or declined; information relating to real estate, vehicles, and other property you may own; information about your purchasing or consuming history or tendencies); Communications Sent Through our Services by Phone, Email, Mail, and Text.; Marketing Engagement Activity (including your clicks or other interactions with emails we generate); Responses to Surveys, Competitions, Promotions, and Sweepstakes. Information From Cookies, Pixels, Web Beacons, HTTP Referrers, and Website Analytics (IP address, cookie ID; browser user ID; domain; browser ID; browser GUID; browser information; language preference; device ID; other unique device identifiers; device type; device model; platform; operating system type information; advertising interactions; website browsing behavior (such as pages viewed on our website and the websites you visit before and after ours, search and browsing history, click tracking, and access date, time, and duration); web log information; and geolocation data). For our full Cookies Policy, please click here; Inferences About You Based on Any of the Above."[10]

---

[10] *Id.*

g.  "While many financial institutions choose to license our software and manage their services to you in a way that does not involve us accessing your personal information and others provide us only with aggregated or deidentified data, or some of our clients provide us with access to their customer databases in order for us to assist them with marketing their products and services."[11]

h.  "How We Use Your Personal Information. Subject to further limitations that may be part of our agreement(s) with your financial institution, we process and maintain personal information provided to us for the following purposes: . . . To perform our contractual obligations to your financial institution. . . . For internal use to build or improve the quality of our services[.]"[12]

i.  "We do not share or disclose personal information for any purpose[.]"[13]

j.  "We build security into our all of our services in order to protect your information."

k.  "We use commercially reasonable and appropriate safeguards, including the encryption of personal information, to secure and protect the privacy, accuracy, and reliability of your information and to protect it from unauthorized access, alteration, disclosure, or destruction."

l.  "We retain the personal information we process only for as long as needed to perform our contractual obligations to the financial institution that

---

[11] *Id.*
[12] *Id.*
[13] *Id.*

collected the information or as needed to comply with legal requirements (including financial record-keeping regulations), for security purposes, or to prevent fraud or  abuse."[14]

21.    This variant of the Privacy Policy was "last updated" by Marquis on September 16, 2020.[15]

22.    However, after the Data Breach, Marquis deleted this variant of the Privacy Policy from its website (and the since-deleted Privacy Policy is now only available on the "Internet Archive").[16]

23.    Specifically, on October 20, 2025, Marquis scrubbed its website and published a new Privacy Policy which (1) deleted much of the language from its past policy, and (2) added new disclaimers such as "there is security risk inherent in all internet and information technologies, and we cannot guarantee the security of your personal information" and that "much of its data processing is exempt from state privacy laws pursuant to financial privacy laws."[17]

24.    However, these deletions and novel disclaimers are inapplicable because the Data Breach occurred approximately sixty-seven (67) days *before* Marquis "scrubbed its website and published the new Privacy Policy.[18]

### Defendants' Data Breach

25.    On August 14, 2025, Defendant Marquis was hacked in the Data Breach.[19]

---

[14] *Id*.
[15] *Id*.
[16] *Id*.
[17] *Privacy Policy*, MARQUIS (Oct. 20, 2025) https://gomarquis.com/privacy-policy.
[18] *Data Breach Notifications*, MAINE ATTY GEN (Nov. 21, 2025) https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/2eb0a98c-c8e9-4d35-bc72-c4e68f5eebb9.html.
[19] *Id*.

26.    Worryingly, Norway has already admitted that:

a.    "On August 14, 2025, a security incident occurred at a third-party data services provider of Norway Savings Bank during which an external actor/system obtained unauthorized access to certain portions of the provider's data environment."[20]

b.    "The personal information that may have been unsecured during this breach are names, addresses, dates of birth, social security numbers, tax identification numbers, and financial account information."[21]

27.    In total, Defendants injured at least 51,000 persons—via the exposure of their PII—in the Data Breach.[22] Upon information and belief, these 51,000 persons include their current and former customers.

28.    And yet, Defendants waited over until November 21, 2025, before it began notifying the class—a full 99 days after the Data Breach began.[23]

29.    Thus, Defendants kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

30.    Defendants failed their duties when their inadequate security practices caused the Data Breach. In other words, Defendants' negligence is evidenced by their failure to prevent the Data Breach and stop cybercriminals from accessing the PII. And thus, Defendants caused widespread injury and monetary damages.

---

[20] *Id*.
[21] *Id*.
[22] *Id*.
[23] *Id*.

31.     Further, the Notice of Data Breach shows that Defendants cannot—or will not—determine the full scope of the Data Breach, as Defendants has been unable to determine precisely what information was stolen and when.

32.     Defendants has done little to remedy their Data Breach. True, Defendants have offered some victims credit monitoring and identity related services. But upon information and belief, such services are wholly insufficient to compensate Plaintiff and Class Members for the injuries that Defendants inflicted upon them.

33.     Because of Defendants' Data Breach, the sensitive PII of Plaintiff and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiff and Class Members.

***Plaintiff's Experiences and Injuries***

34.     Plaintiff David Robinson Sr. is a former customer of Norway.

35.     Thus, Defendants obtained and maintained Plaintiff's PII.

36.     As a result, Plaintiff was injured by Defendants' Data Breach.

37.     Plaintiff is very careful about the privacy and security of his PII. He does not knowingly transmit his PII over the internet in an unsafe manner.  He is careful to store any documents containing his PII in a secure location.

38.     Plaintiff provided his PII to Defendants and trusted the company would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law. Defendants obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

39.     Plaintiff reasonably understood that a portion of the funds paid to Defendants would be used to pay for adequate cybersecurity and protection of PII.

40.    Thus, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

41.    Through their Data Breach, Defendants compromised Plaintiff's PII.

42.    Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft.

43.    And in the aftermath of the Data Breach, Plaintiff suffered from a spike in spam and scam phone calls (up to ten per day).

44.    Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

45.    Because of Defendants' Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

46.    Plaintiff suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

47.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendants was required to adequately protect.

48.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendants' Data Breach placed Plaintiff's PII right in the hands of criminals.

49.    Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

50.    Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

***Consumers Prioritize Data Security***

51.    In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[24] Therein, Cisco reported the following:

    a.    "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[25]

    b.    "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[26]

    c.    89% of consumers stated that "I care about data privacy."[27]

    d.    83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[28]

---

[24] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited March 19, 2025).
[25] *Id*. at 3.
[26] *Id*.
[27] *Id*. at 9.
[28] *Id*.

e.      51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[29]

f.      75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[30]

***Plaintiff and the Proposed Class Suffered Common Injuries and Damages***

52.      Because of Defendants' failure to prevent the Data Breach, Plaintiff and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, uncompensated lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a.      loss of the opportunity to control how their PII is used;

b.      diminution in value of their PII;

c.      compromise and continuing publication of their PII;

d.      out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

e.      lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

f.      delay in receipt of tax refund monies;

g.      unauthorized use of their stolen PII; and

---

[29] *Id*.
[30] *Id*. at 11.

h.    continued risk to their PII—which remains in Defendants' possession—and is thus as risk for futures breaches so long as Defendants fails to take appropriate measures to protect the PII.

***Substantially Increased Risk of Identity Theft and Fraud***

53.    Plaintiff and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

54.    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201 (2013).

55.    The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

56.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (aka the Dark Web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

57.    The "Dark Web" is an unindexed layer of the internet that requires special software or authentication to access.[31] Criminals in particular favor the Dark Web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, Dark Web

---

[31] *What Is the Dark Web?*, EXPERIAN, https://www.experian.com/blogs/ask-experian/what-isthe-dark-web/ (last visited July 9, 2025).

users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the Dark Web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[32]  This prevents Dark Web marketplaces from being easily monitored by authorities or accessed by those not in the know.

58.    The unencrypted PII of Plaintiff and Class Members has or will end up for sale on the Dark Web because that is the modus operandi of hackers. In addition, unencrypted and detailed PII may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the Plaintiff's and Class Members' PII.

59.    Theft of Social Security numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of their SSN, and a new SSN will not be provided until after the victim has suffered the harm.

60.    In particular, the theft of Social Security numbers—in combination with other PII (e.g., name, address, date of birth)—provides cybercriminals with a "skeleton key" to commit rampant fraud and identity theft.

61.    For example, cybersecurity expert Jim Stickley explained to Time Magazine that "[i]f I have your name and your Social Security number, and you haven't gotten a credit freeze yet, you're easy pickings . . . With that, you can do whatever you want . . . You can become that

---

[32] *Id.*

person."[33] For context, Jim Stickley is a "penetration tester" who is employed by businesses "to infiltrate their systems in order to find flaws they can fix before the bad guys exploit them."[34]

62.    There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breach may go undetected until debt collection calls commence months, or even years, later. An individual may not know that their Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

63.    For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[35]

64.    It is within this context that Plaintiff and all other Class Members must now live with the knowledge that their PII is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

65.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take

---

[33] Patrick L. Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME MAGAZINE (Aug. 5, 2019) https://time.com/5643643/capital-one-equifax-data-breach-social-security/.
[34] *Id*.
[35] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. SYSTEMICS, CYBERNETICS & INFORMATICS 9 (2019) http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

66.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

67.    Identity thieves can also use an individual's personal data and PII to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.[36]

68.    One example of criminals piecing together bits and pieces of compromised PII to create comprehensive dossiers on individuals is called "Fullz" packages.[37]  These dossiers are both

---

[36] *Identity Theft and Your Social Security Number,* SOCIAL SECURITY ADMINISTRATION, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited July 9, 2025).

[37] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone

shockingly accurate and comprehensive. With "Fullz" packages, cybercriminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the stolen PII, and with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

69.     The development of "Fullz" packages means that the PII exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other Class Members' stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

70.     According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[38]

---

with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm,* KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/   medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

[38] *2019 Internet Crime Report* (Feb. 11, 2020) FED. BUREAU INTELLIGENCE, https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited July 9, 2025).

71.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."  Yet, Defendant failed to rapidly report to Plaintiff and the Class that their PII was stolen.  Defendant's failure to promptly and properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff's and Class Members' injuries by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

72.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

73.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

74.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiff and Class Members will need to remain vigilant for years or even decades to come.

***Defendants Knew—Or Should Have Known—of the Risk of a Data Breach***

75.    Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

76.    In  2024,  a  record  3,158  data  breaches  occurred—exposing  approximately

1,350,835,988 sensitive records (i.e.,  211% increase year over year).[39]

77.    Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[40]

78.    Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including Defendant.

***Defendants Could Have Prevented the Data Breach***

79.    Data breaches are preventable.[41] Indeed, the American Bar Association published a treatise titled the *Data Breach and Encryption Handbook* wherein the author explained that:

a.    "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[42]

b.    "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised[.]"[43]

---

[39] *2024 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.

[40] Ben Kochman,  *FBI*, *Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[41] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH AND ENCRYPTION HANDBOOK (2012).

[42] *Id.* at 17.

[43] *Id.* at 28.

      c.    "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs." [44]

### Defendants Failed to Follow FTC Guidelines

80.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

81.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[45]  The FTC declared that, *inter alia*, businesses must:

      a.    protect the personal customer information that they keep;

      b.    properly dispose of personal information that is no longer needed;

      c.    encrypt information stored on computer networks;

      d.    understand their network's vulnerabilities; and

      e.    implement policies to correct security problems.

82.    The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

---

[44] *Id.*

[45] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

83.     Furthermore, the FTC explains that companies must:

    a.     not maintain information longer than is needed to authorize a transaction;

    b.     limit access to sensitive data;

    c.     require complex passwords to be used on networks;

    d.     use industry-tested methods for security;

    e.     monitor for suspicious activity on the network; and

    f.     verify that third-party service providers use reasonable security measures.

84.     The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

85.     In short, Defendants' failure to use reasonable and appropriate measures to protect against unauthorized access to their current and former customers' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendants Failed to Follow Industry Standards***

86.     Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

87.     Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

88.     Upon information and belief, Defendants failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of one or more of the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

89.     These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendants opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

90.     Plaintiff brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII was compromised in the Data Breach that impacted Defendants in August 2025, including all those individuals who received notice of the breach.

91.     Excluded from the Class are Defendant, their agents, affiliates, parents, subsidiaries, any entity in which Defendants has a controlling interest, any Defendants officer or

director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

92.     Plaintiff reserves the right to amend the class definition.

93.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

94.     <u>Ascertainability</u>. All members of the proposed Class are readily ascertainable from information in Defendants' custody and control. After all, Defendants already identified some individuals and sent them data breach notices.

95.     <u>Numerosity</u>. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes at least 51,000 members.

96.     <u>Typicality</u>. Plaintiff's claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

97.     <u>Adequacy</u>. Plaintiff will fairly and adequately protect the proposed Class's common interests. His interests do not conflict with Class Members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

98.     <u>Commonality and Predominance</u>. Plaintiff's and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

a.  if Defendants had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII;

b.  if Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.  if Defendants were negligent in maintaining, protecting, and securing PII;

d.  if Defendants breached contract promises to safeguard Plaintiff and the Class's PII;

e.  if Defendants took reasonable measures to determine the extent of the Data Breach after discovering it;

f.  if Defendants' Breach Notice was reasonable;

g.  if the Data Breach caused Plaintiff and the Class injuries;

h.  what the proper damages measure is; and

i.  if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

99.  Superiority. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendants would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device

provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

## FIRST CAUSE OF ACTION
### Negligence
### (On Behalf of Plaintiff and the Class)

100.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

101.    Plaintiff and the Class (or their third-party agents) entrusted their PII to Defendants on the premise and with the understanding that Defendants would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

102.    Defendants owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendants' failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

103.    Defendants has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if their PII was wrongfully disclosed.

104.    Defendants owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendants knew or should have known would suffer injury-in-fact from Defendants' inadequate security practices. After all, Defendants actively sought and obtained Plaintiff and Class Members' PII.

105.    Defendants owed—to Plaintiff and Class Members—at least the following duties to:

        a.    exercise reasonable care in handling and using the PII in their care and custody;

      b.     implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

      c.     promptly detect attempts at unauthorized access;

      d.     notify Plaintiff and Class Members within a reasonable timeframe of any breach to the security of their PII.

106.    Thus, Defendants owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

107.    Defendants also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

108.    Defendants knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

109.    Defendants' duty to use reasonable security measures arose because of the special relationship that existed between Defendants and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class (or their third-party agents) entrusted Defendants with their confidential PII, a necessary part of obtaining services from Defendant.

110.    The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendants hold vast amounts of PII, it was inevitable that

unauthorized individuals would attempt to access Defendants' databases containing the PII — whether by malware or otherwise.

111.    PII is highly valuable, and Defendants knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff and Class Members' and the importance of exercising reasonable care in handling it.

112.    Defendants improperly and inadequately safeguarded the PII of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

113.    Defendants breached these duties as evidenced by the Data Breach.

114.    Defendants acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class Members' PII by:

      a.    disclosing and providing access to this information to third parties and

      b.    failing to properly supervise both the way the PII was stored, used, and exchanged, and those in their employ who were responsible for making that happen.

115.    Defendants breached their duties by failing to exercise reasonable care in supervising their agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiff and Class Members which actually and proximately caused the Data Breach and Plaintiff and Class Members' injury.

116.    Defendants further breached their duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class Members' injuries-in-fact.

117.     Defendants has admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

118.     As a direct and traceable result of Defendants' negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

119.     And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

120.     Defendants' breach of their common-law duties to exercise reasonable care and their failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and uncompensated lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendants' negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

**SECOND CAUSE OF ACTION**
**Negligence *per se***
**(On Behalf of Plaintiff and the Class)**

121.     Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

122.     Under the FTC Act, 15 U.S.C. § 45, Defendants had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

123.     Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC

publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendants' duty to protect Plaintiff and the Class Members' sensitive PII.

124.    Defendants breached their respective duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII.

125.    Defendants violated their duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII Defendants had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

126.    The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and members of the Class.

127.    But for Defendants' wrongful and negligent breach of their duties owed, Plaintiff and Class Members would not have been injured.

128.    The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that Defendants was failing to meet their duties and that their breach would cause Plaintiff and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

129.    Defendants' various violations and their failure to comply with applicable laws and regulations constitutes negligence *per se*.

130.     As a direct and proximate result of Defendants' negligence *per se*, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

### THIRD CAUSE OF ACTION
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

131.     Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

132.     Plaintiff and Class Members either directly contracted with Defendants or Plaintiff and Class Members were the third-party beneficiaries of contracts with Defendant.

133.     Plaintiff and Class Members (or their third-party agents) were required to provide their PII to Defendants as a condition of receiving services provided by Defendant. Plaintiff and Class Members (or their third-party agents) provided their PII to Defendants or their third-party agents in exchange for Defendants' services.

134.     Plaintiff and Class Members (or their third-party agents) reasonably understood that a portion of the funds they paid would be used to pay for adequate cybersecurity measures.

135.     Plaintiff and Class Members (or their third-party agents) reasonably understood that Defendants would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendants' duties under state and federal law and their internal policies.

136.     Plaintiff and the Class Members (or their third-party agents) accepted Defendants' offers by disclosing their PII to Defendants or their third-party agents in exchange for services.

137.     In turn, and through internal policies, Defendants agreed to protect and not disclose the PII to unauthorized persons.

138.     In their Privacy Policy, Defendants represented that they had a legal duty to protect Plaintiff's and Class Member's PII.

139.    Implicit in the parties' agreement was that Defendants would provide Plaintiff and Class Members (or their third-party agents) with prompt and adequate notice of all unauthorized access and/or theft of their PII.

140.    After all, Plaintiff and Class Members (or their third-party agents) would not have entrusted their PII to Defendants (or their third-party agents) in the absence of such an agreement with Defendant.

141.    Plaintiff and the Class (or their third-party agents) fully performed their obligations under the implied contracts with Defendant.

142.    The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

143.    Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

144.    Defendants materially breached the contracts it entered with Plaintiff and Class Members (or their third-party agents) by:

      a.    failing to safeguard their information;

      b.    failing to notify them promptly of the intrusion into their computer systems that compromised such information.

      c.    failing to comply with industry standards;

      d.      failing to comply with the legal obligations necessarily incorporated into the agreements; and

      e.      failing to ensure the confidentiality and integrity of the electronic PII that Defendants created, received, maintained, and transmitted.

145.    In these and other ways, Defendants violated their duty of good faith and fair dealing.

146.    Defendants' material breaches were the direct and proximate cause of Plaintiff's and Class Members' injuries (as detailed *supra*).

147.    And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

148.    Plaintiff and Class Members (or their third-party agents) performed as required under the relevant agreements, or such performance was waived by Defendants' conduct.

**FOURTH CAUSE OF ACTION**
**Invasion of Privacy**
**(On Behalf of Plaintiff and the Class)**

149.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

150.    Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

151.    Defendants owed a duty to their current and former customers, including Plaintiff and the Class, to keep this information confidential.

152.    The unauthorized acquisition (i.e., theft) by a third party of Plaintiff and Class Members' PII is highly offensive to a reasonable person.

153.     The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Class (or their third-party agents) disclosed their sensitive and confidential information to Defendant, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

154.     The Data Breach constitutes an intentional interference with Plaintiff's and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

155.     Defendants acted with a knowing state of mind when it permitted the Data Breach because it knew their information security practices were inadequate.

156.     Defendants acted with a knowing state of mind when it failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

157.     Acting with knowledge, Defendants had notice and knew that their inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

158.     As a proximate result of Defendants' acts and omissions, the private and sensitive PII of Plaintiff and the Class were stolen by a third party and is now available for disclosure and rediscosure without authorization, causing Plaintiff and the Class to suffer damages (as detailed *supra*).

159.     And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

160.    Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their PII are still maintained by Defendants with their inadequate cybersecurity system and policies.

161.    Plaintiff and the Class have no adequate remedy at law for the injuries relating to Defendants' continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendants' inability to safeguard the PII of Plaintiff and the Class.

162.    In addition to injunctive relief, Plaintiff, on behalf of himself and the other Class Members, also seeks compensatory damages for Defendants' invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

### FIFTH CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of Plaintiff and the Class)

163.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

164.    This claim is pleaded in the alternative to the breach of implied contract claim.

165.    Plaintiff and Class Members (or their third-party agents) conferred a benefit upon Defendant. After all, Defendants benefitted from (1) using their PII to provide services, and (2) accepting payment.

166.    Defendants appreciated or had knowledge of the benefits it received from Plaintiff and Class Members.

167.    Plaintiff and Class Members (or their third-party agents) reasonably understood that Defendants would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendants' duties under state and federal law and their internal policies.

168.    Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII.

169.    Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

170.    Under principles of equity and good conscience, Defendants should not be permitted to retain the full value of Plaintiff's and Class Members' (1) PII and (2) payment because Defendants failed to adequately protect their PII.

171.    Plaintiff and Class Members have no adequate remedy at law.

172.    Defendants should be compelled to disgorge into a common fund—for the benefit of Plaintiff and Class Members—all unlawful or inequitable proceeds that it received because of their misconduct.

## SIXTH CAUSE OF ACTION
### Breach of Fiduciary Duty
### (On Behalf of Plaintiff and the Class)

173.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

174.    Given the relationship between Defendants and Plaintiff and Class Members, where Defendants became guardian of Plaintiff's and Class Members' PII, Defendants became a fiduciary by their undertaking and guardianship of the PII, to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff and Class Members' PII; (2) to timely notify Plaintiff and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendants did and does store.

175.    Defendants has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of Defendants' relationship with them—especially to secure their PII.

176.    Because of the highly sensitive nature of the PII, Plaintiff and Class Members (or their third-party agents) would not have entrusted Defendant, or anyone in Defendants' position, to retain their PII had they known the reality of Defendants' inadequate data security practices.

177.    Defendants breached their fiduciary duties to Plaintiff and Class Members by failing to sufficiently encrypt or otherwise protect Plaintiff's and Class Members' PII.

178.    Defendants also breached their fiduciary duties to Plaintiff and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

179.    As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

## PRAYER FOR RELIEF

Plaintiff and Class Members respectfully request judgment against Defendants and that the Court enter an order:

A.    Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing his counsel to represent the Class;

B.    Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

C.     Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

D.     Awarding Plaintiff and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

E.     Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

F.     Awarding attorneys' fees and costs, as allowed by law;

G.     Awarding prejudgment and post-judgment interest, as provided by law;

H.     Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I.     Granting other relief that this Court finds appropriate.

### DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all claims so triable.

Date: December 1, 2025          Respectfully submitted,

/s/ *Joe Kendall*
Joe Kendall
Texas Bar No. 11260700
**KENDALL LAW GROUP, PLLC**
3811 Turtle Creek Blvd., Suite 825
Dallas, Texas 75219
T: 214/744-3000
F: 214/744-3015
jkendall@kendalllawgroup.com

Samuel J. Strauss*
Raina C. Borrelli*
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611

T: (872) 263-1100
F: (872) 263-1109
sam@straussborrelli.com
raina@straussborrelli.com

*Pro hac vice forthcoming*

**Attorneys for Plaintiff and Proposed Class**